In re George James CONSIN, a/k/a George J. Consin, formerly d/b/a the Garden Cafeteria, Debtor.

PONDEROSA, INC., Plaintiff,

v.

George James CONSIN, Defendant.

Bankruptcy No. 3–83–00976.
Adv. No. 3–83–0826.

United States Bankruptcy Court,
E.D. Tennessee.

March 21, 1984.

Joe M. Felknor, Knoxville, Tenn., for plaintiff.

Richard Stair, Jr., Knoxville, Tenn., for defendant.

MEMORANDUM

CLIVE W. BARE, Bankruptcy Judge.

I

The issue before the court is the dischargeability of a debt, owing to the plaintiff, allegedly arising from the defendant's breach of a sublease agreement. Plaintiff asserts that the sublease was entered into only after the defendant submitted a financial statement respecting his financial condition; that it relied upon this financial statement; and that the defendant intended to deceive plaintiff by use of the financial statement. Plaintiff seeks a judgment against the defendant in the amount of $64,916.69, representing the amount of its claim against the debtor's estate as calculated pursuant to 11 U.S.C.A. § 502(b)(7) (1979). Plaintiff further seeks a determination that said debt is nondischargeable pursuant to § 523(a)(2)(B) of the Bankruptcy Code.[1]

The defendant maintains that his financial statement was not materially false; was not relied upon by the plaintiff; was not made or published with the intent to deceive the plaintiff; and that plaintiff was, in fact, not deceived by the financial statement.

II

The plaintiff, Ponderosa, Inc., is a Delaware corporation with its principal place of business in Dayton, Ohio. It owns or leases approximately 600 Ponderosa Steak House Restaurants, most of which are situated throughout the Southeastern part of the United States. In June 1980 it was operating Ponderosa Steak House Restaurants on Kingston Pike and at 4416 Chapman Highway, in Knoxville, Tennessee. The Chapman Highway restaurant was leased from Cideco, Inc. at a monthly rental of approximately $3,000.00. Because this restaurant was not being operated profitably, in May or June 1980 Ponderosa decided to terminate operation of the facility. When this decision was made, Mr. Roland S. Barrie, who joined Ponderosa in 1978, was Ponderosa's real estate property management representative. His duties included marketing the sites where Ponderosa Steak House Restaurants had been or were being closed. After the decision was made to close the Chapman Highway restaurant, Barrie began to market Ponderosa's interest in the restaurant facility including equipment and supplies located in the restaurant.

In mid June 1980, the defendant, George Consin, became aware of the potential availability of the Chapman Highway restaurant and contacted Mr. Barrie by telephone, inquiring into the terms under which Ponderosa would agree to a sublease. Consin and Barrie talked by telephone on several occasions. In these conversations Consin represented himself to be a restaurant operator with many years experience, although at the time of these contacts he was not operating a restaurant. On June 27, 1980, Barrie wrote Consin, forwarding him a fact sheet and floor plan of the restaurant (Exhibit 5). Sometime between July 10 and July 15, 1980, Barrie delivered to Consin a key to the restaurant facility. Barrie testified that this key was given to Consin as custodian for the purpose of showing the facility to other potential subtenants with whom Ponderosa might be negotiating. Consin testified that on or about July 15, 1980, Barrie advised him by telephone that he had read a newspaper article depicting Consin's life story; had contacted those people whom Consin

---

1. A discharge ... does not discharge an individual debtor from any debt—

.  .  .  .  .

(2) for obtaining money, property, services, or an extension, renewal, or refinance of credit, by—

.  .  .  .  .

(B) use of a statement in writing—
(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;
(iii) on which the creditor to whom the debtor is liable for obtaining such money, property, services, or credit reasonably relied; and
(iv) that the debtor caused to be made or published with intent to deceive ....
11 U.S.C.A. § 523(a)(2)(B) (1979).

had given as references; had verified what Consin had told him about his bank accounts by calling his banks; and Consin "had" the lease as the lease terms had already been agreed upon. Consin further testified that Barrie advised him that Ponderosa's "lease attorney" was out of town and that the written lease agreement would be mailed to him as soon as possible. Consin further testified that Barrie advised him that he could go ahead and begin remodeling. Consin did in fact have a telephone installed on or about July 24 and did begin some minor remodeling work. Consin denied that he was at any time acting as a "custodian" for Ponderosa but asserted that, after the key was given to him by Ponderosa, he was in possession of the leasehold premises. It is undisputed by Barrie's testimony that, after Consin was given the key to the Chapman Highway facility between July 10 and July 15, 1980, Ponderosa did not itself have access to the facility as neither Barrie nor anyone else from Ponderosa retained a duplicate key. It is further undisputed that the restaurant facility was fully equipped with large and small appliances, tables, chairs, etc. (Exhibit 23).

On August 11, 1980, Ponderosa forwarded to Consin the Ground and Building Sublease, subsequently executed by Consin on August 26, 1980. The sublease was returned to Ponderosa and executed by it on September 8, 1980. The sublease term commenced on October 1, 1980.

On or shortly after July 23, 1980, Consin forwarded to Barrie an undated letter entitled *RE: Intent of Lease Ponderosa Premises, 4416 Chapman Highway, Knoxville, TN* (Exhibit 7), to which a financial statement dated July 23, 1980, was attached (Exhibit 2 and Exhibit 7). Consin testified that this letter merely confirmed the terms of the sublease previously agreed upon orally by Ponderosa through prior telephone conversations with Barrie and that the financial statement was forwarded at Barrie's request without explanation as to the intended use by Ponderosa of the statement. Consin further testified that at no time was he informed that Ponderosa's intention to go forward with the sublease was in any respect contingent upon his financial statement. However, Barrie testified that the financial statement was an important part of the sublease package as far as Ponderosa was concerned and that he and his superiors relied upon it in their decision to go forward with Consin.

An internal Ponderosa memorandum, dated July 31, 1980, from T.J. Sandeman to Messrs. O'Bryan, Sagehorn and Starr, entitled *Subject: Sublease Offer—Unit # 664, Knoxville, Tennessee* (part of collective Exhibit 8) discusses the advisability of subleasing the Chapman Highway facility to Consin and concludes:

We recommend proceeding subject to:

1. Confirmation of bank balances.

2. Obtaining Mr. Consin's intended use, as well as, other general business information.

3. Obtaining landlords consent, if necessary.

4. Obtaining the six months security deposit in lieu of the personal guarantee up front in cash.

5. Coordinating the removal of the extra equipment with Maintenance/Operations.

A review of this memorandum clearly indicates that Ponderosa was in possession of Consin's July 23, 1980, financial statement on or prior to July 31, 1980. Barrie, however, testified that neither he nor anyone else from Ponderosa confirmed Consin's bank balances. Furthermore, Ponderosa did not obtain the six months security deposit as recommended by the memorandum.

On October 7, 1980, Barrie wrote an internal memorandum to Thomas J. Sagehorn entitled "# 664—Knoxville, Tenn." (Exhibit 11) relative to invoices received by Ponderosa from the Knoxville Utilities Board showing electricity charges on the Chapman Highway leasehold premises for the period from July 10, 1980, (the approximate date upon which Consin received the key to the property) to October 1, 1980,

when the utility service was transferred to Consin. The memorandum includes the following statement in reference to the utility bill: "However, it would appear at least $1,189.64 should be paid by Consin for the usage between July 10 and October 1." At the bottom of this memorandum Mr. Sagehorn hand wrote the following question, addressing it to Mr. Barrie: "(1) Was Consin *in possession* from July 10—Oct 1 despite no lease?" There is no response evidenced on the memo by Barrie to this question.

Consin, approximately 62 years of age, is a Greek immigrant. He obtained a sixth grade education in Greece before moving to this country some fifty years ago. After arriving in the United States he studied the English language for about two years. This is the extent of Consin's formal education. In his dealings with Ponderosa in June and July 1980, he dealt exclusively with Roland S. Barrie and had no contact with Mr. Sagehorn, Mr. Sandeman, or any other Ponderosa representative. His dealings with Barrie were exclusively by telephone; he and Barrie did not meet face-to-face until December 1982, when Mr. Barrie was in Knoxville. Consin operated the Garden Cafeteria at the premises which he subleased from Ponderosa but, due to substantial losses, he closed the cafeteria in December 1982.

Barrie testified that approval at various levels was required within the Ponderosa system prior to the execution of the sublease with Consin. Barrie did not testify, however, that he advised Consin of the required chain of approval. In fact, Consin testified that, since he had dealt exclusively with Barrie, he thought that Barrie had the final say on behalf of Ponderosa insofar as the sublease agreement was concerned. Consin further testified that he relied upon Barrie's mid July representations that he, Consin, "had" the lease. The court finds that Consin dealt exclusively with Barrie and was not aware that any approval other than Barrie's was necessary as to the sublease agreement.

It is undisputed that the July 23, 1980, financial statement forwarded to Ponderosa by Consin contains information which is at least partially incorrect. For example, in that portion relating to Mr. Consin's assets the financial statement reflects in part:

1. Paragraph 1 indicates that Consin had $35,000.00 cash on hand and unrestricted in the bank. In fact, Consin's July bank statement from the Bank of Knoxville reflects that on July 23, 1980, he had the sum of $20,279.44 on deposit in an account which he held jointly with his wife Mary Consin. During the month of July the maximum balance in this account was approximately $25,000.00 on July 1 and the minimum balance was approximately $19,100.00 on July 31. Mr. Consin also testified that in addition to the funds on deposit in this bank account he had in excess of $10,000.00 cash.

2. Paragraph 9 reflects that Consin held real estate valued at $85,000.00 in his own name. Although this real estate was in fact appraised by Dott Baker Agency at a 1980 value of $81,750.00 (Exhibit 16), it was jointly owned by Consin and his wife as tenants by the entirety.

3. Paragraph 8 reflects that Consin owned stock and securities valued at $10,000.00. Mr. Consin did own approximately 2,900 shares of the common stock of Francis Consolidated Mining & Milling Corporation (Exhibit 14) which he testified he valued at between $4.00 and $5.00 per share, the amount for which he originally purchased the stock. On an unknown date, Francis Consolidated Mining & Milling Corporation went out of business.

4. Paragraph 11 reflects the ownership of two certificates of deposit totaling $69,000.00 in value. In fact there were two certificates of deposit in the amounts of $34,500.00 each, owned by C.C. Pack and Mountain Shadows, Inc., which had been endorsed and assigned to Alcoa Banking Company, Trustee, pursuant to the provisions of a Substitution of Collateral and Trust Agreement dated August 17, 1978 (Exhibit 17). Pursuant to the provisions of

this agreement these certificates of deposit were pledged as collateral for the payment of obligations of Mountain Shadows, Inc. represented by four promissory notes, each also in the amount of $34,500.00, payable to Consin and his wife. As of July 23, 1980, two of these notes remained unpaid. Under the provisions of the Substitution of Collateral and Trust Agreement, failure of Mountain Shadows, Inc. to pay a promissory note when due triggered payment from one of the certificates of deposit held in trust by Alcoa Banking Company. Consin testified that the two notes payable after July 23, 1980, were timely made. The court finds that the two certificates of deposit in the Alcoa Banking Company were placed there for the use and benefit of Mr. and Mrs. Consin.

5. Paragraph 12 reflects that Consin had gold and silver holdings totaling $150,000.00 in value. Consin testified that for a period of time during the winter of 1979 and through the spring of 1980 he purchased gold and silver from the public at a business location which he maintained on Chapman Highway in Knoxville. This was strictly a cash business and Consin kept no records documenting purchases or sales. He further testified that in his opinion, on July 23, 1980, his gold holdings, consisting of bullion and scrap gold, were worth approximately $75,000.00 and that his silver holdings, consisting of coins having a face value of approximately $3,000.00, were worth twenty-five times the face value, or approximately $75,000.00. He subsequently determined that approximately five 16-ounce gold bars, acquired from a transient couple, represented as gold bullion are in fact valueless gold plated bars. It is abundantly clear that Consin was a speculator who entered the gold and silver market at a time when these markets were at a peak and at a time in which numerous sophisticated and unsophisticated investors were buying and selling gold and silver. The court finds that Consin was not a sophisticated buyer of gold and silver and was one of apparently many unsophisticated investors who was unwittingly duped into purchasing nonprecious metals fraudulently represented to be precious metals.

During the latter part of 1980 and thereafter the gold and silver markets fell dramatically. Also, Consin's Garden Cafeteria did not flourish. From August 21, 1980, the date he opened the Garden Cafeteria bank account with the Bank of Knoxville, through December 1982, when Garden Cafeteria closed its doors, Consin's bank statements reflect that he deposited in excess of $63,000.00 of his personal funds into the restaurant account. (Exhibit 20 consists of those bank statements of the Garden Cafeteria reflecting these deposits.) Consin's 1981 tax return (Exhibit 21) evidences operating losses attributable to the operation of the Garden Cafeteria at $20,241.00, and his 1982 tax return (Exhibit 22) evidences operating losses of $22,381.00.

### III

Four elements must be established by the plaintiff in order to maintain a prima facie case of nondischargeability under 11 U.S.C.A. § 523(a)(2)(B). It is incumbent upon the plaintiff to establish that the debtor obtained money, property, services, or an extension, renewal, or refinancing of credit by use of a statement in writing (1) that is materially false; (2) respecting the debtor's financial condition; (3) on which the plaintiff reasonably relied; and (4) that was published by the debtor with intent to deceive. The plaintiff's failure to prove any one of the above elements must result in a dismissal of the Complaint. *First Security Bank v. Ardelean*, 28 B.R. 299 (Bkrtcy.N.D.Ill.1983).

The two principal issues for the court in this case are (1) whether the plaintiff reasonably relied on the July 23, 1980, financial statement and (2) whether the defendant caused the financial statement to be made or published with intent to deceive. Both issues must be answered affirmatively to support a finding of nondischargeability under Code § 523(a)(2)(B).

The word "reasonable" is not defined in the Bankruptcy Code, and what is reasonable must be determined in accordance

with the facts surrounding each individual case. In the instant case the following salient facts control on this issue:

1. The plaintiff and defendant had no prior acquaintance or business dealings with one another prior to mid June 1980 when Consin contacted Barrie about the Chapman Highway property. Further, Consin dealt exclusively with Barrie, and he had no knowledge of the chain of approval Ponderosa generally required before executing any sublease agreement. Barrie and Consin did not meet formally until December 1982, when Barrie was in Knoxville at the Chapman Highway leasehold premises.

2. At some point between July 10 and July 15, 1980, Ponderosa, through Barrie, gave Consin the key to the Chapman Highway leasehold property and did not retain any key for itself. From that day forward Consin was in exclusive possession of the Chapman Highway property, consisting not only of the real property but also considerable personal property in the form of restaurant equipment and small appliances.

3. Ponderosa deemed Consin to be responsible for the utility service provided by the Knoxville Utilities Board from July 10, 1980, to October 1, 1980, the date the sublease agreement became effective.

4. Ponderosa was unable to profitably operate its own restaurant at the Chapman Highway premises and was anxious to procure a subtenant in order to meet its own $3,000.00 monthly rental obligation to Cideco, Inc.

5. Consin had physically taken possession of the leasehold premises after the key was delivered to him by Ponderosa. He installed a telephone and commenced some minor remodeling.

■ The court concludes that Ponderosa delivered the leasehold premises to Consin prior to Consin's delivery to it of his July 23, 1980, financial statement. Thus the financial statement could not have been relied upon by Ponderosa in its decision to sublet the premises to Consin. Further, given the fact that Ponderosa had absolutely no prior dealings with Consin and knew absolutely nothing about him or his business background and took no steps to verify the accuracy of his financial statement, the court can only conclude that any reliance on his financial statement was not reasonable. In order to satisfy Code § 523(a)(2)(B)(iii) a creditor must not only prove reliance upon the debtor's financial statement but also that such reliance was reasonable. *Village Bank and Trust Co. v. Futterman*, 35 B.R. 102 (Bkrtcy.D.Conn. 1983). *Futterman* also points out that an emerging rule in dealing with this section is that *under certain circumstances* a creditor's failure to verify the information contained in a financial statement renders reliance on that statement unreasonable.

■ Finally, the court concludes that plaintiff has failed to establish that Consin had any intention of deceiving Ponderosa when he forwarded his July 23, 1980, financial statement to Barrie. Consin had been told by Barrie that the lease was his and that the execution of the sublease agreement was a mere formality. The court is satisfied that he could not have intended to deceive Ponderosa since he believed that the leasehold premises were his prior to the preparation of his financial statement.

Because Ponderosa has not maintained its burden of proof, the court finds that the complaint should be dismissed.

This Memorandum constitutes findings of fact and conclusions of law, Bankruptcy Rule 7052.